**William M. SCOTT, III, and Charles W. Puttkammer, Plaintiffs,**

v.

**MULTI–AMP CORPORATION, et al., Defendants.**

Civ. No. 74–1382.

United States District Court, D. New Jersey.

Nov. 13, 1974.

As Amended Nov. 20, 1974.

Supplemental Opinion Nov. 22, 1974.

As Amended Nov. 26, 1974.

Riker, Danzig, Scherer & Brown by Alvin Weiss, Dennis J. O'Grady, Newark, N. J., for plaintiffs.

Clapp & Eisenberg by Jerome C. Eisenberg, Newark, N. J., Edward Ross Aranow, New York City, Armond D. Arnson, Cleveland, Ohio, for defendants.

## OPINION

LACEY, District Judge:

### INTRODUCTORY STATEMENT

This matter is before the court on the parties' cross motions for interim injunctive and other relief, as hereinafter detailed. Implicated by the pleadings and the motions are certain provisions of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. § 78a et seq., as amended by the Williams Act of 1968.[1] Plaintiffs' complaint charges defendants with violating §§ 13(d) and 14(a) of the Exchange Act, 15 U.S.C. § 78m(d), 15 U.S.C. § 78n(a), and relevant rules and regulations of the Securities and Exchange Commission (Commission) promulgated thereunder, including Rule 13d–1, 17 C.F.R. § 240.-13d–1 (1974), and Rule 14a–9, 17 C.F.R. § 240.14a–9 (1974); and the statutes and common law of the State of New Jersey. Defendants' answer not only denies these charges but counterclaims with charges of §§ 13(d) and 14(a) violations by plaintiffs.[2] Jurisdiction and

1. Act of July 29, 1968, Pub.L. No. 90–439, 82 Stat. 454, amending 15 U.S.C. §§ 78m–78n (1964) [codified at 15 U.S.C. §§ 78m(d), (e), 78n(d)–(f) (Supp. V, 1965–69), as amended, 15 U.S.C. §§ 78m(d), (e), 78n(d)–(f) (1970)].

2. Sec. 13(d) states:

(d)(1) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 12 of this title, or any equity security of an insurance company which would have been required to be so registered except for the exemption contained in section 12(g) (2)(G) of this title, or any equity security issued by a closed-end investment company registered under the Investment Company Act of 1940, is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors—

(A) the background and identity of all persons by whom or on whose behalf the purchases have been or are to be effected;

(B) the source and amount of the funds or other consideration used or to be used in making the purchases, and if any part of the purchase price or proposed purchase price is represented or is to be represented by funds or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding, or trading such security, a description of the transaction and the names of the parties thereto, except that where a source of funds is a loan made in the ordinary course of business by a bank, as defined in section 3(a)(6) of this title, if the person filing such statement so requests, the name of the bank shall not be made available to the public;

(C) if the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plans or proposals which such persons may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure;

(D) the number of shares of such security which are beneficially owned, and the number of shares concerning which there is a right to acquire, directly or indirectly, by (i) such person, and (ii) by each associate of such person, giving the name and address of each such associate; and

(E) information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or guaranties of profits, division of losses or profits, or the giving or withholding of proxies, naming the persons with whom such contracts, arrangements, or understandings have been entered into, and giving the details thereof.

(d)(2) If any material change occurs in the facts set forth in the statements to the issuer and the exchange, and in the statement filed with the Commission, an amendment shall be transmitted to the issuer and the exchange and shall be filed with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

(d)(3) When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a "person" for the purposes of this subsection.

(d)(4) In determining, for purposes of this subsection, any percentage of a class of any security, such class shall be deemed to consist of the amount of the outstanding securities of such class, exclusive of any securities of such class held by or for the account of the issuer or a subsidiary of the issuer.

(d)(5) The Commission, by rule or regulation or by order, may permit any person to file in lieu of the statement required by paragraph (1) of this subsection or the rules and regulations thereunder, a notice stating the name of such person, the number of shares of any equity securities subject to paragraph (1) which are owned by him, the date of their acquisition and such other information as the Commission may specify, if it appears to the Commission that such securities were acquired by such person in the ordinary course of his business and were not acquired for the purpose of and do not have the effect of changing or influencing the control of the issuer nor in connection with or as a participant in any transaction having such purpose or effect.

(d)(6) The provisions of this subsection shall not apply to—

(A) any acquisition or offer to acquire securities made or proposed to be made by means of a registration statement under the Securities Act of 1933;

(B) any acquisition of the beneficial ownership of a security which, together with all other acquisitions by the same person of securities of the same class during the preceding twelve months, does not exceed 2 per centum of that class;

(C) any acquisition of any equity security by the issuer of such security;

(D) any acquisition or proposed acquisition of a security which the Commission, by rules or regulations or by order, shall exempt from the provisions of this subsection as not entered into for the purpose of, and not having the effect of, changing or influencing the control of the issuer or otherwise as not comprehended within the purposes of this subsection.

Sec. 14(a) provides:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title.

venue are in this court under § 27 of the Exchange Act, 15 U.S.C. § 78aa, as to the Exchange Act claims, and under pendent jurisdiction principles on plaintiffs' state-created claim.[3]

## RELIEF SOUGHT

In their complaint, plaintiffs, who sue in their own right and derivatively, Fed.R.Civ.P. 23.1; N.J.S.A. 14A:3–6, in the right of Multi-Amp Corporation (M–A), defendant herein, seek preliminary and permanent injunctive relief which would enjoin the defendants Lerner, Saltzman, Redlhammer and Esquivel from utilizing as soliciting material management's Proxy Statement dated August 16, 1974, from soliciting proxies from M–A shareholders, from voting or otherwise exercising any rights in connection with proxies heretofore solicited or obtained, from committing any violations of the Exchange Act, from voting at the annual meeting, now set for October 30, 1974, any shares of M–A stock owned by them or by L & S Investment Company (L & S), and from implementing or consummating the proposed sale of assets, by M–A to the defendant MUL Company (MUL), which is at the core of this proceeding. While challenging the named plaintiffs' capacity to sue derivatively, defendants do not challenge their standing to sue individually, as stockholders, for §§ 13(d) and 14(a) violations. *Cf.* GAF Corporation v. Milstein, 453 F.2d 709, 719 n. 21 (2d Cir. 1971), cert. denied, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972); Committee for New Man. of Butler Aviation v. Widmark, 335 F.Supp. 146, 154 n. 9 (E.D.N.Y.1971); *but see* Washburn v. Madison Square Garden Corp.,

340 F.Supp. 504 (S.D.N.Y.1972). In this regard, it is noted that given the liberal application of the standing doctrine in the area of securities law by this Circuit, Landy v. Federal Deposit Ins. Corp., 486 F.2d 139 (3d Cir. 1973), this court expressly finds that plaintiffs do have standing to sue to vindicate §§ 13(d) and 14(a) violations.

The defendants have counterclaimed for preliminary and permanent injunctive relief to bar plaintiffs from utilizing their proxy material, and to enjoin them from voting their own shares, and the shares of others, at the annual meeting.

## THESE PROCEEDINGS

This court signed an Order to Show Cause with temporary restraints on September 6, 1974, later modified by its order of September 13, 1974.

On the applications for interim relief, the parties put before the court the pleadings, various affidavits, the several depositions taken to date, and lengthy briefs. Following these submissions, oral argument was heard on October 9, 1974. The parties have agreed to waive an evidentiary hearing on plaintiffs' claims.

Defendants, on the other hand, request an evidentiary hearing on their § 13(d)-based counterclaim, which as been held.

Before addressing the principal issues involved, it is to be noted that plaintiffs, having been given the list of stockholders of M–A after commencing suit, moved thereafter for the disclosure of (a) the names of all persons whose M–A stock is held in street-name, and (b) the

3. So far as here pertinent, § 27 provides:

The district courts of the United States, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder . . . . Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

names of those persons whose stock is with Cede & Co., a certain stock depository. At oral argument on October 9, 1970, I denied application (a) but granted (b), staying the latter ruling, however, to allow defendants to make a written submission in opposition thereto. That submission having been made, and found unpersuasive, the stay is now lifted, and an appropriate order is to be submitted forthwith. The court's determination is founded upon what it stated at oral argument on October 9, 1970, and the reasons immediately hereinafter expressed.

The New Jersey Business Corporation Act, N.J.S.A. 14A:5-28(1), provides in relevant part:

> The corporation shall make available for inspection . . . a record or records containing the names and addresses of all shareholders, the number, class and series of shares held by each and the dates when they respectively became the owners of record thereof . . . .

Defendants would argue that this statute, literally applied, would require only that a list of all shareholders of record on the corporate books be made available for inspection. As previously stated, M–A has already furnished a list of shareholders of record to plaintiffs.

■ Since management now receives from Cede & Co. a monthly list of "participants", *see* letter of defendants' counsel dated October 11, 1974, fairness compels that management should make available to plaintiffs the same information so that this proxy solicitation campaign can be waged on equal terms by both sides.

■ Regarding shareholders who have shares in street-name, the court is not inclined to give the restrictive construction to N.J.S.A. 14A:5-28 defendants urge. *Cf.* Rule 14a-7, 17 C.F.R. § 240.14a-7 (1974); *and see* § 14(c) of the Exchange Act, 15 U.S.C. § 78n(c), which was added in 1964 and pursuant to which the Commission, by Rule 14c-7, 17 C.F.R. § 240.14c-7 (1974) requires

issuers subject to the proxy rules to canvass the registered owners of the securities known to be held in street-name. Instead, its refusal to require that the names of shareholders holding shares in street-name be determined and divulged is based not only upon policy considerations, namely, that such owners should have their desire for privacy protected, but also because management, unlike the Cede situation, is also without the information plaintiffs seek. *See* Cary, Corporations 311-12 (4th ed. 1969). Although not relevant to the issue raised, it should be noted that the court recognizes that derivative suits can be brought by shareholders who are equitable holders, and not of record. N.J.S.A. 14A:3-6 (Commissioners' Comments); Drachman v. Harvey, 453 F.2d 722 (2d Cir. 1972) (en banc).

## THE PARTIES

*Plaintiffs*

Plaintiffs Scott and Puttkammer are stockholders of defendant M–A, a New Jersey corporation, with its principal place of business in Texas, which, with its subsidiaries, is engaged in various aspects of the electrical testing industry.

*Defendants*

MUL is a recently organized Delaware corporation, the stock of which is entirely owned by defendants Lerner, Saltzman, Redlhammer and Esquivel, formed by them to acquire M–A's assets. Lerner (M–A's Board Chairman and Chief Executive Officer) and Saltzman each own beneficially 81,798 shares (8.99%) of M–A's common stock (totalling in excess of 900,000 shares), acquired on April 15, 1970, and registered in the name of L & S, a partnership owned fifty-percent by Lerner, with the other fifty-percent owned by Saltzman and a corporation (Lodar, Inc.) he controls. Redlhammer (M–A's President) and Esquivel (M–A's Vice President for Finance) own respectively 28,471 (3.13%) and 196 (.02%) shares of M–A common stock, and are, with Lerner and Saltzman, directors of M–A, as is Baker

(who was elected on July 10, 1974). Berick is also an M–A director and a partner in the Cleveland, Ohio law firm of Burke, Hahn & Berick, which has served as M–A's general counsel; he owns 500 shares (.05%) of M–A's common stock. Other M–A directors were, until recently, Glenn Golenberg, whose place was taken by Baker, and James Hellmuth, an outside director whose principal occupation is as a vice president of Bankers Trust Company. Their resignations were filed and accepted on July 10 and August 1, 1974, respectively.

## DISCUSSION

Generally, plaintiffs charge that at a time prior to July 26, 1974, defendants Lerner, Saltzman, Redlhammer and Esquivel, in addition to violating certain securities laws, conspired to acquire M–A's assets "at a grossly inadequate price [$5,494,965 or $6.04 per share of M–A stock] and to liquidate . . . [M–A], to the detriment of the stockholders . . . and, pursuant to said conspiracy, formed defendant MUL for the purpose of acquiring the assets of Multi-Amp." Complaint, para. 11. More specifically, plaintiffs charge defendants have acted illegally in the particulars hereinafter set forth.

*Plaintiffs' § 13(d) Claims*

Plaintiffs contend, first, that L & S, Lerner and Saltzman, having acquired on April 15, 1970 18% of M–A's stock [registered pursuant to § 12 of the Exchange Act, 15 U.S.C. § 78*l*] from the Gross family, then M–A's principal shareholders, were by April 25, 1970 required to, but did not, comply with the filing requirements of § 13(d).[4] Plaintiffs further assert that the § 13(d) filing requirement was triggered again when, on or about July 10, 1974, Lerner and Saltzman, then in control of M–A, were joined "in concert" by Redlhammer and Esquivel, M–A stockholders and Board members, with the resultant "group" (i.e., Lerner, Saltzman, Redlhammer and Esquivel), *see* § 13(d)(3), 15 U.S.C. § 78m(d)(3), having as its new objective the sale of M–A's assets to MUL, and the subsequent liquidation of M–A. Pffs. Br. at 14; Pffs. Reply Br. at 27.[5] It is undisputed that defendants made no § 13(d) filing whatever until August 5, 1974.

Pursuant to § 13(d)(1), the Commission by Rule 13d–1, promulgated Schedule 13D, 17 C.F.R. § 240.13d–101 (1974), for those required to file thereunder. This Schedule must be filed with the Commission and the issuer's listing ex-

---

4. Isidor Gross, one of the sellers, was at the time Chairman of the Board and President of M–A. Berick Affidavit, para. 3.

5. Thus, plaintiffs argue that (Pffs. Br. at 13–14) :
 . . . at least by the directors' meeting of July 10, 1974 Redlhammer and Esquivel were joining Lerner and Saltzman as part of a group negotiating for the purchase of Multi-Amp's assets. (Ex. P. 2 *id*; Tr. 9–7; 60–10; 63–2; 121–9; 209–19; 241–9). Whether they can be considered part of the group earlier in view of Lerner's testimony that in thinking about the plan Redlhammer and Esquivel would be part of the group (Tr. 241–17) we need not get involved with on this application.
 . . .
 *See also* Pffs. Reply Br. at 27, where it is stated that Redlhammer and Esquivel, "on or prior to July 10, 1974 . . . agreed to act in concert [with Lerner and Saltz-

man] in relation to their stock holdings in Multi-Amp. This necessitates the filing of an amendment to what should have been the prior filings by Lerner and Saltzman . . ." In this regard it is noted that § 13(d)(2) requires amendment to a previously filed Schedule 13D where "any material change occurs in the facts set forth in the . . . [Schedule 13D]." *See* note 2, *supra*. It is obvious that if L & S, Lerner and Saltzman had filed a Schedule D in April 1970 it would not have named Redlhammer and Esquivel as being in their group, and it would not have stated that it was the purpose of those acquiring control to "liquidate . . . [the] issuer, [or] to sell its assets . . . ." *See* § 13(d)(1)(C). Thus, plaintiffs continue, the Lerner group, even if it had filed in April 1970, would be in violation of § 13(d) when it failed to file an Amended Schedule 13D within 10 days after July 10, 1974.

changes (here the American Stock Exchange), and served upon the issuer, within ten days after the acquisition of more than five-percent of the issuer's stock.[6] Amendments thereto are required when material changes occur in the facts stated therein. § 13(d)(2), 15 U.S.C. § 78m(d)(2).

In GAF Corporation v. Milstein, 453 F.2d 709 (2d Cir. 1971), cert. denied, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972), the purpose of § 13(d) was explicated:

> That the purpose of section 13(d) is to alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control is amply reflected in the enacted provisions. Section 13(d)(1)(C) requires the person filing to disclose any intention to acquire control. If he has such an intention, he must disclose any plans for liquidating the issuer, selling its assets, merging it with another company or changing substantially its business or corporate structure. It is of some interest, moreover, that section 13(d)(6)(D) empowers the Commission to exempt from the filing requirements "any acquisition . . . as not entered into for the purpose of, and not having the effect of, changing or influencing the control of the issuer or otherwise as not comprehended within the purpose of [section 13(d)]."

453 F.2d at 717. *See also* H.R.Rep. No. 1711, 90th Cong., 2d Sess. 8–9 (1968), U.S. Code Cong. & Admin.News 1968, p. 2811; Comment, Section 13(d) and Disclosure of Corporate Equity Ownership, 119 U.Pa.L.Rev. 853 (1971).

Addressing the first of plaintiffs' § 13(d) claims, defendants admit they failed to file a Schedule 13D within ten days of April 15, 1970, but argue that they were under no obligation to do so; and, further, that if they were guilty of a statutory violation, it was somehow cured by the several disclosures, both before and after April 15, 1970, of the fact of their control of M–A.

Thus they contend that they were not obliged to file under § 13(d), since their assumption of control, through L & S's acquisition of M–A's shares from the Gross family, was accomplished not covertly but rather with the knowledge and cooperation of the then management, personified by Mr. Isidor Gross.[7] The evil intended to be cured by § 13(d), non-disclosure to management and the market place of a potential corporate "take-over," did not exist, they say, in the circumstances attending their purchase. Defendants succinctly argue: ". . . there was no failure to alert management of the shift in control since it was management itself from whom the stock was purchased." Defs. Br. at 41.

Next, defendants advance the fact that the April 1970 acquisition was heralded, first, a month in advance of, and then on the day of closing, by widely distributed press releases. Berick Affidavit, paras. 5 and 6.

After acquisition of control, defendants next contend that there was a "continuous stream of public disclosure over the last four and one-half (4½) years" in the 1970–1973 Proxy Statements and in the various filings with the Commission.[8] Defs. Br. at 41–42.

---

6. In April 1970 the reporting amount was 10%. It was reduced to 5% on December 22, 1970.

7. Plaintiffs do not deny that the Gross family (including Isidor Gross) were the sellers of the M–A stock purchased by L & S, Lerner and Saltzman. Neither do they deny that Isidor Gross at the time was Board Chairman and President.

8. Because M–A's securities are listed on the American Stock Exchange it is required by Section 13(a) of the Securities Exchange Act of 1934, 15 U.S.C. 78m(a), and Rules 13a–1, 13a–13 and 13a–11, to file annual reports with the Commission on Form 10–K, quarterly reports on Form 10–Q and current reports of material corporate developments on Form 8–K. *Cf.* SEC v. Koenig, 469 F.2d

Plaintiffs' response to the defendants' disclaimers of § 13(d)'s application to the 1970 events is two-pronged. First, plaintiffs argue that no matter how extensive the disclosure, the defendants' non-filing of a Schedule 13D in April 1970 served to conceal from M–A's stockholders and the investing public for over four years one vital fact required to be stated under § 13(d)(1)(B), namely, that Lerner and Saltzman had financed their M–A stock purchase by borrowing $700,000, at the same time granting their lenders an option to purchase 19,000 shares of M–A stock at the price paid by Lerner and Saltzman.[9] Shielding this information from disclosure, plaintiffs claim, makes defendants' violation not merely technical, but most substantial.

More fundamentally, plaintiffs claim that the mere fact that the replaced management (here Gross) was aware of the new "control" group's presence, does not excuse compliance with the § 13(d) filing requirement.

■ ■ Plaintiffs have the better of the dispute. First, the disclosure of the "take-over" to the public and the stockholders, while demonstrative of the new owners' openness and candor, and supportive of their claim of *ignorantia legis*, Defs. Br. at 40, did not relieve the Lerner group of its statutory obligation to file a Schedule 13D. Second, § 13(d) was intended to protect not only the old management, but, as well, stockholders and the investing public. *See* Bath Industries v. Blot, 305 F.Supp. 526, 538 (E.D.Wisc.1969), aff'd, 427 F.2d 97 (7th Cir. 1970).

Dealing with the first of plaintiffs' § 13(d) claims, then, the fact that L & S, Lerner and Saltzman should have filed initially under § 13(d) not later than April 25, 1970 is self-evident. It is equally obvious, as already stated, that they did not do so until August 5, 1974, thus violating the statutory mandate, however innocent their oversight. Mosinee Paper Corp. v. Rondreau, 500 F.2d 1011 (7th Cir. 1974).[10]

198, 200 n.3 (2d Cir. 1972). In this regard defendants refer to the following statements and filings (Defs. Br. at 41–42):
(1) The 1970 proxy statement informed shareholders of the transaction under the heading "CHANGE OF CONTROL".
(2) The 1971, 1972, 1973 and 1974 proxy statements disclose the stock interest of L & S under two separate headings— "Election of Directors" and "Principal Shareholders".
(3) The Forms 3 filed in early May 1970 by Lerner, Saltzman and L & S all disclose their purchase of Multi-Amp stock.
(4) The Form 8–K filed by Multi-Amp for the month of April 1970, contains a detailed description of the transaction under the heading "CHANGES IN CONTROL OF REGISTRANT".
(5) The Forms 10–K filed annually for the fiscal years ended April 30, 1971–74, all reveal the positions held by Lerner and Saltzman.* (¶7 of Berick Affidavit). . .
* It is significant that at no time after receipt of any of these documents did the S.E.C. ever suggest the necessity or advisability of filing a Schedule 13D, until July 24, 1974, on which date it inquired as to whether or not MUL had considered filing a Schedule 13D in respect of its proposed purchase of assets from Multi-Amp. (¶7 of Berick Affidavit).

9. Thus plaintiffs state (Pffs. Br. at 12–13): In the Proxy Statement sent to shareholders for the 1970 annual meeting of Multi-Amp, not only is the loan and option not disclosed but a clear impression is given that Lerner and Saltzman own their stock outright and are not beholden to anyone.

. . . . .

Again, in April, 1973, Lerner and Satlzman obtained an extension in the repayment of the loan and in turn extended the period for the lenders to exercise the option to acquire the 19,000 shares of Multi-Amp stock from Lerner and Saltzman. None of this was known to stockholders when they were asked to vote . . . [at the annual meeting] in September, 1973

. . . . .

It would appear that this information as to the source of the $700,000 "did not become public" (Pffs. Br. at 13) until August 5, 1974 when appropriate § 13d filings were made. See Exhibit P–7.

Plaintiffs have not offered any other significant information of which M–A stockholders and the investing public were deprived by defendants' violation in April 1970.

10. The *Mosinee* court stated:
. . . Congress has deemed it appropriate that investors and management be fully advised of this potential to effect control

Given the violation, what is the remedy and what are the sanctions to be applied by this court on plaintiffs' application?

Plaintiffs' position is that, by virtue of the aforesaid violation, they are now entitled to the drastic interim relief sought in their complaint.

The violation of § 13(d), however, does not automatically cause the invocation of the drastic sanctions plaintiffs seek. The unusual circumstances of this case require, in the interest of justice and equitable principles, a careful sifting of the facts before settling upon the appropriate form of relief.

It is evident from the facts heretofore related that L & S, and Lerner and Saltzman did not, in the manner of the feared corporate buccaneer, stealthily creep up upon and dethrone M–A's management in April 1970. Their control was achieved by purchase from the dominant management figure, Isidor Gross, then Chairman of the Board and president of M–A, who, after the purchase, remained as a director (*see* 1970 Proxy Statement, Exhibit C to Berick Affidavit); and defendants broadcast widely what they were about to do, and what they did do. Furthermore, this court accepts the unchallenged assertions of Lerner, Saltzman and L & S that their counsel failed to advise them of the filing requirement, *see* Defs. Br. at 40; Berick Affidavit, para. 4, and finds that the failure to file a Schedule 13D in April 1970 was inadvertent and devoid of any intent to violate the law or conceal vital facts from management, M–A's stockholders, or the investing public. *Cf.* Cary, Corporations 548–49 (4th ed. 1969).

Nor are there any facts involved in the Lerner group's management of the business, after April 15, 1970, which would undercut the conclusion that the 1970 violation of § 13(d) was merely a technical one, harming no significant interests intended by that statute to be protected, and depriving no one of information material to their investment decisions. Certainly plaintiffs, and Gross (who is substantially financing this suit), knew in the post-1970 period that the Lerner group was in control. Scott, since June 8, 1971, has been retained by M–A as a "finder" of acquisitions pursuant to written agreement; and Gross and his wife each has an unexpired consulting agreement with M–A which has 5½ years remaining, representing combined future receipts of about $250,000. It is also noteworthy that the plaintiffs nowhere contend that they, or other stockholders or the investing public, were unaware of the persons who controlled M–A, and they offer no complaint about the company's management after April 1970. Additionally, the record is bare of any issue having been contemporaneously raised concerning the accuracy or adequacy of M–A's Proxy Statements in 1971, 1972 or 1973. Nor do the plaintiffs now complain that the defendants were guilty in or after 1970 of any manipulative practices related to the price of M–A's shares.

Continuing the detailing of the company's affairs, in May 1973 M–A began relocation of its facilities from Cranford, New Jersey to Dallas, Texas, completing this in April 1974. It remains a New Jersey corporation, however, although it no longer has any facilities here.

The New Jersey Business Corporations Act having been amended in 1968, counsel advanced to M–A's management in 1973 the existence, under the law as amended, of the right to change the cer-

---

so that investors may evaluate and adequately assess the corporation's worth in view of the potential, while at the same time allowing management the opportunity to appropriately respond to any potential for a shift in control.
500 F.2d at 1016. Reference has been made to defendants' "innocent . . . over-

sight" because, in addition to arguing they were not subject to § 13(d) in 1970, defendants also claim their attorney did not advise them of the necessity for a Schedule 13D filing, and they were unaware of the requirement therefor. Defs. Br. at 40.

tificate of incorporation (by a two-thirds vote) to provide for stockholder approval by a majority vote of mergers, consolidations, liquidations, and bulk sales of assets out of the ordinary course of business. Collier Affidavit, para. 3, and Exhibit A thereto. Management submitted this question and others suggested by counsel to the stockholders in its 1973 Proxy Statement (Lerner Affidavit, para. 6), and it was adopted at the September 1973 annual meeting.[11]

As the Proxy Statement for the upcoming meeting states (Complaint, Exhibit A at 17), M–A's management entered into merger discussions with research-Cottrell, Inc. in November 1973. Discussions were abandoned on February 25, 1974 because of "the steady weakening in the market price and trad-

ing volume of Research-Cottrell shares."[12] It further appears that Combustion Engineering, Inc., through one Kiamie, made a telephonic inquiry in mid-August 1974 of Lerner which, at most, was nothing more than an indication of interest in acquiring M–A. Nothing came of this. Defs. Br. at 34; Lerner Affidavit, paras. 26–27.[13]

It thus can be said that from and after April 1970, into June 1974, the Lerner group's failure to file Schedule 13D when it acquired control had caused no injury to anyone to any substantial degree. As has been stated, the replaced management certainly cannot claim it was thereby damaged. Stockholders and investors, even including plaintiffs herein, do not and cannot claim they were misled or deceived. All were fully apprised of the change in control. None

11. Plaintiffs point out that, in the Proxy Statement, management stated it had no present intention

to present any propositions to which the proposed change in voting pertained, but merely wanted greater flexibility for future action. Notwithstanding this statement in the 1973 Proxy Statement, within 45 days of the change in voting requirements for merger or liquidation Multi-Amp announced a proposed merger with Research-Cottrell, Inc. and within ten months of the change a plan to sell the assets of Multi-Amp to a corporation owned by Lerner, Saltzman, Redlhammer and Esquivel, and to liquidate Multi-Amp. Pffs. Br. at 2–3

There is no charge of fraud, however, or any effort made by plaintiffs herein to vacate the result of the vote approving the amendment. Indeed, there appears to have been no complaint registered by plaintiffs when the proposed merger with Research-Cottrell, Inc. was first announced, or when it was abandoned. Plaintiffs omit to state that the Lerner management undertook merger discussions in February 1972, prior to the charter change. There is no indication that the subsequent charter change was for any reason other than that it would afford greater flexibility to management. Venality is not mirrored by the easing of the voting requirements.

12. See the following excerpt from page 17 of the Proxy Statement:

On February 25, 1974, both Research-Cottrell and the Corporation withdrew from the proposed merger. The Corpora-

tion's withdrawal was based on the steady weakening in the market price and trading volume of Research-Cottrell shares. At the time of this withdrawal, the total market value of the shares of Research-Cottrell which would have been received under the merger was approximately $10,000,000, based on the then current Research-Cottrell market price of $32.00 per share. Based upon the August 14, 1974 Research-Cottrell market price of $7\frac{1}{8}$ per share, the total current market value of the shares of Research-Cottrell which would have been received if the merger had been consummated is approximately $2,200,000.

As to this the defendants state (Defs. Br. at 19):

. . . within the nine-month period from November, 1973 to August 1974 the total market value of the Research-Cottrell shares which would have been received under the proposed merger decreased from $15,500,000 to $2,200,000. The present market value of such shares is approximately $1,300,000.

13. It is of interest that Isidor Gross has apparently exerted some effort to interest Combustion Engineering, Inc. in M–A. Defs. Br. at 7–8. Plaintiffs, as will be hereinafter noted, complain that the 1974 Proxy Statement omits mention of the Combustion Engineering inquiry. Their complaint has no merit. Regarding prior acquisition, the said Proxy Statement properly sets forth not only the Research-Cottrell proposed transaction, but also, at 17, that involving Perkin-Elmer Corporation.

can validly claim he was kept ignorant of the potential for a shift in control which, where it exists, may influence a decision to buy or sell securities. Mosinee Paper Corp. v. Rondreau, *supra*. No contention is advanced upon any theory, tenuous or otherwise, that the corporation, its stockholders, or the investing public suffered any harm, let alone the irreparable injury requisite to the drastic remedy of the injunctive relief plaintiffs herein seek.[14] Finally, no explanation is given for delaying over four years before asserting a complaint grounded upon defendants' § 13(d) violation in 1970.

Under the foregoing circumstances the drastic relief of disenfranchisement of Lerner, Saltzman and L & S, or the other interim relief sought by plaintiffs, would be grossly inappropriate. As has been said in a more cheerful environment than securities law:

My object all sublime
I shall achieve in time—
To make the punishment fit the crime.

The Mikado, Act II.

That the remedies plaintiffs here seek were granted in whole or in part in Bath Industries, Inc. v. Blot, *supra*, Mosinee Paper Corp. v. Rondeau, supra, and by Chief Judge Whipple in Water & Wall Associates Inc., note 14, *supra*, can afford them no comfort. In those cases the issuer, in stark contrast to the laxness of these dilatory plaintiffs, had acted with celerity and dispatch to achieve the application of equitable sanctions to § 13(d) violations.

Therefore, the interim relief sought, as grounded upon the April 1970 § 13(d) violation, is denied, for the following reasons:

1. Plaintiffs have failed to show they have sustained irreparable injury causally related to the said violation. *Cf.* Mosinee Paper Corp. v. Rondeau, *supra*, where the majority would seemingly waive the irreparable injury requirement, and the dissent therein by Judge Pell.

2. Plaintiffs have not demonstrated a likelihood that on final hearing they will prevail in obtaining the relief they seek, principally because, on what is before me, the doctrines of laches and estoppel present formidable barriers to their success, and particularly in view of the broad power of this court, as a court of equity, to frame a decree, and accord that relief, which is under all the circumstances best tailored for the wrong committed and the injury done. *See, e. g.*, Lemon v. Kurtzman, 411 U.S. 192, 200–201, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973); Hecht Co. v. Bowles, 321 U.S. 321, 329–330, 64 S.Ct. 587, 88 L.Ed. 754 (1944); Crane Co. v. American Standard, Inc., 490 F.2d 332, 345 (2d Cir. 1974).

3. The public interest in securing adherence to the statutory mandate of a § 13(d) filing is not served, under the peculiar circumstances of this case, by granting the relief sought.[15] Thus, as-

---

14. *See, e.g.*, Delaware River Port Authority v. Transamerican Trailer Transport, Inc., No. 74–1214 (3d Cir. filed July 30, 1974). As Chief Judge Whipple of this district stated in another § 13(d) case, Water & Wall Associates Inc. v. American Consumer Industries, Inc., [1973 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 93,943, at 93,753 (D.N.J. 1973):

On an application for a preliminary injunction, the movant must show that he will suffer irreparable injury absent the relief sought, that it is likely he will prevail at a final hearing upon the merits, that the harm he will suffer if the relief is withheld is greater than the harm the defendant will suffer if the relief is granted and

that the public interest demands granting the relief requested. Penn Galvanizing Co. v. Lukens Steel Co., 468 F.2d 1021, 1023 (3d Cir. 1972); A.L.K. Corp. v. Columbia Pictures, Industries, Inc., 440 F.2d 761, 763 (3d Cir. 1971); Nelson v. Miller, 373 F.2d 474, 477 (3d Cir. 1967); Warner Brothers Pictures, Inc. v. Gittone, 110 F.2d 292, 293 (3d Cir. 1940). In this Court's view, irreparable harm is a combination of material injury to a substantial degree and the inadequacy of money damages. Tully v. Mott, 337 F.Supp. 834, 850 (D.N.J.1972). . . . .

15. The supremacy of the public interest in securities cases is made markedly clear by

suming that the proposed sale of assets is fairly priced, should not *all* the stockholders be given an opportunity, as provided by law, to vote upon it? Moreover, it can hardly be said that the aforesaid public interest is served by the untimely levying of equitable sanctions upon stockholders whose management of M–A over a four-year period had been publicly proclaimed, and, so far as the record currently reflects, conducted without substantial criticism from anyone.[16] It is noted in this regard that, on August 5, 1974, a Schedule 13D was filed, to be effective as of April 25, 1970.

We now turn to the second of plaintiffs' § 13(d)-based claims, founded upon the Lerner group's failure to make a § 13(d) filing in July 1974. As has been noted (note 5, *supra*), plaintiffs contend that a new "group" had been formed not later than July 10, 1974, consisting of Lerner, Saltzman, Redlhammer and Esquivel, which by that date had fixed upon the objective of acquiring, through their wholly owned corporation, MUL, all of M–A's assets. Thus,

plaintiffs state, the filing requirement of § 13(d) was triggered, but was once again ignored. Defendants reject these propositions on two grounds:

1. Their "group" was not formed in the § 13(d) sense, until on or about July 29, 1974, and thus defendants' filing on August 5, 1974 of a Schedule 13D advancing the group's existence and its objective was a timely filing.

2. That there was no filing requirement in any event, since after April 1970 the Lerner group, as then constituted, had gained control, was "management", and was not subject to § 13(d).

As to the first of defendants' responses, it requires an examination of the numerous submissions in order to resolve the question of fact presented, to wit, when can it be said, if at all, that the "group" was formed for § 13(d) purposes? GAF Corporation v. Milstein, 453 F.2d at 715; § 13(d)(3). In this regard, the parties have waived an evidentiary hearing on this issue, and have agreed to have it resolved through the court's analysis of the several depositions and affidavits.

the courts. *See, e.g.*, Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341 (2d Cir.), cert. denied, 414 U.S. 910, 94 S. Ct. 232, 38 L.Ed.2d 148 (1973) ; Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., 476 F.2d 687 (2d Cir. 1973) ; S.E.C. v. Everest Management Corp., 475 F.2d 1236 (2d Cir. 1972) ; S.E.C. v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1100–1106, (2d Cir. 1972).

The cases reflect a delicately maintained balance between many competing considerations. Thus the interest of the plaintiffs, defendants, the government, public investors and others must be considered, and overall is the philosophy of "resolving doubts in favor of those the statute is designed to protect". Mills v. Electric Auto-Lite Co., 396 U.S. 375, 385, 90 S.Ct. 616, 622, 24 L.Ed.2d 593 (1970).

16. *See* Nicholson File Co. v. H. K. Porter Co., 341 F.Supp. 508 (D.R.I.1972), aff'd, 482 F.2d 421 (1st Cir. 1973) ; In re Penn Central Securities Litigation, 347 F.Supp. 1327, modified in part on other grounds, 357 F.Supp. 869 (E.D.Pa.1972) ; Ozark Air Lines, Inc. v. Cox, 326 F.Supp. 1113 (D.Mo. 1971). *See also* Comment, The Courts and

the Williams Act: Try a Little Tenderness, 48 N.Y.U.L.Rev. 991 (1973) ; *and see* Mosinee Paper Corp. v. Rondeau, 500 F.2d at 1020 (Pell, J., dissenting) :

I cannot do otherwise than to agree with Judge Doyle [of the Western District of Wisconsin, who had decided the case below] on the basis of the facts as established by him, which are not disputed by the majority opinion, that there was no basis for a determination of irreparable injury to the plaintiff. To grant an injunction on the sole basis of a belated filing appears to me to be exalting form over substance, to be bringing an artificial and unduly restrictive sanction into the law of securities, and to be ignoring the real purpose of the Williams Act, which "was designed for the benefit of investors and not to tip the balance of regulation either in favor of management or in favor of the person seeking corporate control," GAF Corporation, *supra*, 453 F.2d at 717 n. 16, particularly in the situation when corporate control had not yet been an objective at the time of the unreported acquisitions. In sum, without irreparable harm being shown injunctive relief is not warranted.

The court has carefully reviewed the relevant materials upon which the parties rely, specifically the affidavits (including exhibits) of Messrs. Lerner, Berick, Collier, Redlhammer and Helmuth; the deposition testimony of Messrs. Lerner, Saltzman, Esquivel and Redlhammer; and the exhibits attached to the verified complaint. From these materials the following facts emerge.

On June 7, 1974, M–A's Board of Directors by unanimous written consent, without meeting (N.J.S.A. 14A:6–7), set September 18, 1974 as the date of the annual meeting of shareholders. It appears that Lerner, shortly prior to June 7, had preliminary discussions with counsel and with Saltzman concerning not only the acquisition of M–A's assets, but other means as well of changing M–A into a private entity. Lerner Affidavit, para. 7.

At a Board Meeting on July 10, 1974 Golenberg resigned from the Board. The 1974 Proxy Statement (Complaint, Exhibit A, at 21) states why, that is, that he was being retained by MUL in connection with the proposed acquisition of M–A's assets. At this meeting Lerner disclosed to the Board that he, Saltzman, Redlhammer and Esquivel "were considering a proposed transaction pursuant to which . . . [they] would acquire all of the assets of the Corporation for a price yet to be determined." Lerner Affidavit, para. 8. The Board passed a resolution authorizing continuation of negotiations with Lerner, Saltzman, Redlhammer and Esquivel, or any of them, for the sale of M–A's assets, and also authorized corporate counsel to prepare appropriate preliminary proxy materials for the proposed sale and a plan of liquidation.[17]

During the week of July 24, 1974, M–A's counsel conferred with the Commission. The Commission suggested that there be a public announcement disclosing the proposed transaction with MUL, even though no purchase price had as yet been determined. Lerner felt that such action, without a purchase price stated, would be inadvisable and accordingly consulted with Saltzman, Redlhammer and Esquivel, counsel for M–A and MUL, the other directors, and a proxy solicitation firm, on July 27 and July 28, 1974. The objective of these conversations was to arrive at a fair price, which would not only exceed per share the book value but also the market price on the American Stock Exchange. Out of this came a proposed purchase price of $5.5 million, and thereafter, on July 29, 1974, M–A issued a public announcement of the proposed offer by MUL to acquire M–A's assets. See Lerner Affidavit, paras. 12–13, and Exhibit B to Lerner Affidavit.

Within a few days, and, more specifically, by letter of August 1, 1974, Hellmuth resigned as a Director. See Lerner Affidavit, para. 14, and Exhibit C to Lerner Affidavit. Hellmuth resigned because he felt he could not vote for the proposed purchase of assets at the announced price "without an independent, well-known investment banking firm with knowledge of all the facts, giving its opinion that this is a fair price." The fact of this resignation, and the letter that Hellmuth wrote, is set forth in the 1974 Proxy Statement.

Prior to the final preparation of the Proxy Statement, Lerner discussed with counsel whether an independent appraisal in connection with the proposed transaction was required. He was advised that none was necessary and so his initial determination was to forego one. See Lerner Affidavit, para. 15. However, once this suit was commenced, and it became apparent that plaintiffs' primary thrust was at the lack of such an appraisal, Lerner decided to obtain one; and the investment banking firm of Edwards & Hanly Securities, Inc. was retained to render a written opinion on the fairness of the price of $6.04 per share. See Lerner Affidavit, para. 16.

By letter dated September 18, 1974, Edwards & Hanly submitted its opinion

17. *See* Minutes of July 10, 1974 Board meeting, Exhibit A to Lerner Affidavit, 3–4.

(Lerner Affidavit, Exhibit D). This letter concludes:

> Based on the foregoing, it is our opinion that the issuance of cash in the amount of $6.04 per share in exchange for the assets of Multi-Amp Corporation would be fair and equitable to the shareholders of Multi-Amp Corporation.

Thereafter, by letter of October 1, 1974, Edwards & Hanly submitted to the Commission, at its request, a detailed report in support of its opinion letter. See Lerner Affidavit, para. 17, and Exhibit E to Lerner Affidavit.

Notwithstanding defendants' position that there was no requirement for filing a Schedule 13D in connection with the July-August 1974 matters, on August 5, 1974 a Schedule 13D, and Amendments 1, 2 and 3, were filed with the Commission and served upon the American Stock Exchange and M–A itself, under the following circumstances.

There apparently was a certain amount of doubt at the Commission as to whether there was a necessity for filing a Schedule 13D in respect of the proposed assets transaction. Indeed, Lerner was advised by his counsel that on July 25, 1974 Gerald Seigan, a Commission staff member, had stated that no filing by MUL was necessary since it was not proposing to purchase any additional shares of M–A, but rather its assets. He was also advised, however, that the Commission was giving the subject additional consideration. Thus, the next day, counsel spoke with a Commission representative to express counsel's view that no Schedule 13D filing was required and requested an opportunity of further discussion with the staff. Lerner Affidavit, paras. 19–20.

On July 30, 1974 this meeting occurred, Lerner and his attorney (Arnson) maintaining that no 13D filing was required. Lerner Affidavit, para. 21. During this meeting, which incidentally was focusing on the necessity of MUL filing a Schedule 13D, a staff member inquired whether a Schedule 13D had been filed in con-

nection with the April 15, 1970 acquisition of M–A stock. Lerner said he was not aware of any such filing. Seigan of the staff then suggested that there be filed on behalf of the Lerner group an original Schedule 13D for the April 15, 1970 transaction, along with any amendments thereto "culminating in an amendment relating to the proposed purchase of the Corporation's assets by MUL." Lerner Affidavit, para. 22. The recommended filing followed.

On August 15, 1974, plaintiff Scott demanded inspection of the shareholders' list, which was at that time denied to him (Complaint, Exhibits B and C). However, after suit was commenced, defendants delivered the list to plaintiffs' counsel.

At the August 15, 1974 Board meeting, the Board (Lerner, Saltzman, Redlhammer, Esquivel, Berick and Baker) unanimously approved the Proxy Statement and the proposed transaction with MUL.

On or about August 16, 1974, M–A sent out the Notice of Annual Meeting of Shareholders with a Proxy Statement soliciting the stockholders to grant proxies to be voted in favor of the sale to MUL of M–A's assets, followed by the latter's liquidation, at the annual meeting to be held on September 18, 1974. Annexed to the Proxy Statements are copies of the pertinent resolutions, the Plan of Complete Liquidation, and the Agreement between M–A and MUL. By court order the meeting date, as has already been noted, has been changed to October 30, 1974.

█ Based upon the foregoing factual detail, with particular stress being placed upon the minutes of the Board meeting of July 10, 1974, the court concludes that the Lerner, Saltzman, Redlhammer and Esquivel "group" was, for § 13(d) purpose, in being as of July 10, 1974, and that it had, as of that date, formulated the purpose to sell M–A's assets to MUL. That the organizing of the "group" was not evidenced by a written agreement between its members, that ne-

gotiations between the "group" and MUL were barely under way, and that a purchase price was not set until July 29, 1974, do not alter that conclusion. These latter factors are not to be regarded in the same light as the conditions which in Nicholson File Co. v. H. K. Porter & Co., 341 F.Supp. 508 (D.R.I.1972) tolled the running of § 13(d)'s 10-day filing period. *Cf.* Water & Wall Associates v. American Consumer Industries, Inc., *supra.*

Assuming that § 13(d) was applicable, then, when should a filing have been made? The statute requires that the original § 13(d) filing be made within 10-days of the activating event. § 13(d)(1). Plaintiffs contend that the July 1974 events created the necessity for what would have been an amendatory filing, had there been an original filing in April 1970; and the amendatory provision of the statute, § 13(d)(2), sets no time limit for filing of amendments, but simply requires filing of "an amendment . . . in accordance with such rules and regulations as the Commission may prescribe . . . ." *See* note 2, *supra.* The appropriate Rule, 13d–2, simply requires that the amendment be filed "promptly".[18] Under all the circumstances, the court considers that filing by August 5, 1974, was a "prompt" filing within the meaning of the Rule, although it has not been referred to, nor has it found, any judicial interpretation which would illuminate the matter. The court considers, as going to the issue of promptitude, the still remaining uncertainty, based upon the aforesaid discussions with the Commission, concerning the necessity of filing a Schedule 13D at all, the fact that MUL, even as of August 5, 1974, had not yet been finally incorporated, and the fact that the price was not set until July 29, 1974, when, in response to the Commission's suggestion, the public announcement of the proposed transaction was made.

The immediately preceding analysis is founded upon the premise that § 13(d) applies to a management "group." Now to be examined is defendants' contention that there is no such statutory requirement.

The question was raised, but not expressly answered, in now Chief Judge Kaufman's opinion for the court in GAF Corporation v. Milstein, *supra*, 453 F.2d at 719 n. 20, as follows:

> The more difficult question, and a question we need not decide on this appeal, is whether management groups which expressly agree to pool their interests to fight a potential takeover are subject to section 13(d). Nor do we intimate any view on whether an insurgent group which has filed under section 13(d) and subsequently is successful in its takeover bid remains subject to the section. In any event, as we have already indicated, the Commission can forestall any untoward effects under the exemptive power conferred upon it by section 13(d)(6)(D).

Elsewhere in his opinion, however, Chief Judge Kaufman stated:

> The history and language of section 13(d) makes it clear that the statute was primarily concerned with disclosure *of potential changes in control* resulting from new aggregations of stockholdings . . . . (emphasis supplied)

*Id.* at 718. *See also* Nicholson File Co. v. H. K. Porter Co., 341 F.Supp. at 517–518.

The question raised but not decided in GAF Corporation v. Milstein, *supra*, was presented in Corenco Corporation v. Schiavone & Sons, Inc., 362 F.Supp. 939

---

18. Rule 13d–2, 17 C.F.R. § 240.13d–2 (1974), reads as follows:

> If any material change occurs in the facts set forth in the statement required by § 240.13d–1, the person who filed such statement shall promptly file with the Commission and send to the issuer and the exchange an amendment disclosing such change. Eight copies of each such amendment shall be filed with the Commission.

(S.D.N.Y.), aff'd on part and remanded in part, 488 F.2d 207 (2d Cir. 1973). There a company the target of a tender offer brought suit against the offeror on various grounds under the securities laws. The defendant, *inter alia*, counterclaimed and charged the target company with violating § 13(d) by having violated its filing requirements. The district court wrote:

> The purpose of Section 13(d) is to disclose changes in corporate control. This purpose would not be furthered in the present case by requiring the filing of a Schedule by a management which resists a tender offer when the Schedule would only duplicate information already disclosed.

362 F.Supp. at 951.

On appeal the Court of Appeals stated:

> Turning to the Schiavone defendants' counterclaim that Corenco's management and their affiliates were a "group" within the meaning of § 13(d)(3) and were required to file a Schedule 13D statement by reason of their pooling of their Corenco shares for the purpose of defeating the tender offer, it is unclear what "independent interest" protected by the statute exists which gives the Schiavone defendants standing to assert their counterclaim. See Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 944–946 (2d Cir. 1969). Assuming they have standing, however, we are satisfied that the members of Corenco's management were not required to file individual Schedule 13D statements when they agreed to pool their interests to fight the threatened takeover. Section 14(d)(4) of the Exchange Act specifically requires the disclosure of certain information when the management of a company advises its shareholders to reject a tender offer. Corenco's management complied with this section when it filed a form 14D. Since the Exchange Act contains a specific provision governing the disclosures required of a target company's management, it would be pointless to superimpose requirements found in another section, which does not deal specifically with management disclosures. The reliance placed by the Schiavone defendants on GAF v. Milstein, *supra*, is misplaced. There the court expressly declined to decide the question "whether management groups which expressly agree to pool their interests to fight a potential takeover are subject to section 13(d)." 453 F.2d at 719 n. 20.

488 F.2d at 218. *See also* Bath Industries, Inc. v. Blot, 427 F.2d at 113:

> The purpose of the filing and notification provisions is to give investors and stockholders the opportunity to assess the insurgents' plans *before* selling or buying stock in the corporation. It additionally gives them the opportunity to hear from incumbent management on the merit or lack of merit of the insurgents' proposals. If the defendant-appellant's late filing is sufficient, then no insurgent group will ever file until news of their existence and plan leaks out and prompts a law suit. By that time it will be too late to avoid the evils which the Williams Act is designed to eliminate.

In the case at bar defendants had to file [under § 14(a)] their proxy material with the Commission. It would make no sense, in view of the language and history of the Williams Act, to hold that management, here the L & S-Lerner, Saltzman group, had to file a Schedule 13D, in original or amended form, simply because they were joined by Redlhammer and Esquivel who, as senior officers and directors of M–A for several years, were likewise "management." By the same token, § 13(d) was hardly intended to deal with a management which, after being in control over the years, determines to sell all assets and liquidate a company. The proxy mechanism, and the pervasiveness of the Commission's controls, through statute and rule, over it, required no buttressing by § 13(d)-imposed restraints; and, as

the legislative history of the Williams Act illustrates, it was not in the proxy regulation area of securities law that ills were sensed, or intended thereby to be cured, when in 1968 that salutary legislation was enacted.

 Contemplating then, not only the language of the statute, but the broad congressional purpose, Tcherpnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), and for the reasons hereinabove expressed, this aspect too of plaintiffs' § 13(d) claims must be decided against them.[19]

### Plaintiffs' § 14(a) Claims

Plaintiffs also avow that defendants' proxy material is materially false and misleading, and hence violative of § 14(a) of the Exchange Act (15 U.S.C. § 78n), note 2 *supra*, which makes it unlawful for any person to solicit any proxy "in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." Pursuant to this grant of authority, the Commission promulgated Rule 14a–9(a), 17 C.F.R. § 240.14a–9(a) (1974), prohibiting solicitation by means of a proxy statement "containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication . . . which has become false or misleading."[20]

Plaintiffs' standing to assert a private right of action for an alleged § 14(a) violation is of course no longer in doubt. J. I. Case v. Borak, 377 U.S. 426, 431–432, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). The critical determination, in such litigation, is whether a statement, or an omission, is "material". "Materiality" for § 14(a) purposes has been defined in General Time Corp. v. Talley Industries, Inc., 403 F.2d 159, 162 (2d Cir. 1968), cert. denied, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969):

> The test, we suppose, is whether, taking a properly realistic view, there is a substantial likelihood that the mis-

19. The filing of an original Schedule 13D, and Amendments 1, 2 and 3, on August 5, 1974, has been touched upon. Amendment 3 relates to the new "group" and the challenged sale of M–A's assets to MUL. The filing was done at the Commission's direction, one which could not realistically be regarded lightly under the circumstances.
While an agency's reasoned and articulated interpretation of its own rules and regulations is ordinarily entitled to judicial deference, Shea v. Vialpando, 416 U.S. 251, 94 S. Ct. 1746, 40 L.Ed.2d 120 (1974); NLRB v. Bell Aerospace Co., 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 210, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); Griggs v. Duke Power Co., 401 U.S. 424, 433–434, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Delaware River Port Authority v. Transamerican Trailer Transport, Inc., 591 F.2d 917 (3d Cir., 1974); Pennsylvania v. EPA, 500 F.2d 246, 257 (3d Cir. 1974); Contractors Ass'n. v. Schultz, 442 F.2d 159, 175 (3d Cir. 1971), that doctrine is inapplicable here. Cf. Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct.

161, 89 L.Ed. 124 (1944); Addison v. Holly Hill Fruit Products, 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944). The direction of a staff member, given only after much vacillation, on an ad hoc and informal basis, and without any rationalization, hardly qualifies as an interpretation implicating the doctrine of judicial deference.

20. Rule 14(a)9, 17 C.F.R. § 240.14a–9, provides in pertinent part:
(a) No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

statement or omission may have led a stockholder to grant a proxy to the solicitor or to withhold one from the other side, whereas in the absence of this he would have taken a contrary course.

*See also* Mr. Justice Harlan's statement in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384–385, 90 S.Ct. 616, 24 L. Ed.2d 593 (1970), citing with apparent approval the test of materiality of General Tire Corp. v. Talley Industries, Inc., *supra.*[21]

Plaintiffs' complaint (par. 16) charges defendants with twelve § 14(a) violations; however, in their Brief at 22–23, and at oral argument, they addressed themselves to only five of these. Those not advanced beyond the complaint stage have been examined; they are without merit. The remaining five, as set forth in plaintiffs' Brief at 22–23, are:

(1) The failure to disclose that the Directors, Lerner, Saltzman, Redlhammer and Esquivel, have violated Section 13d of the Exchange Act, 15 U.S. C. 78m(d);

(2) The failure to adequately disclose the circumstances surrounding the resignation of James G. Hellmuth as a director;

(3) The failure to obtain and disclose an independent outside review of the fairness of the purchase price for Multi-Amp's business;

(4) The failure to disclose overtures by the Combustion Engineering Corporation and other potential purchasers of Multi-Amp's assets and the inclusion of the misleading statement that, " . . . there can be no assur-

ance that other offers to acquire the corporation will be forthcoming in the future." (Complaint, Exhibit A, p. 17); and

(5) The failure to disclose that the defendant director, James H. Berick, whose occupation is listed as an attorney, is also a trustee and officer of Realty ReFund Trust (a real estate investment trust controlled by Lerner) (Tr. 231-7), and a director and Vice President of ReFund Advisors, Inc. (the advisor of Realty ReFund Trust, and also controlled by Lerner) (Tr. 231-8).

Defendants respond that their counsel have not only had extensive conferences with the Commission, but that their initial draft of Proxy Statement, submitted to the Commission on July 19, 1974, was substantially revised after the Commission staff meticulously reviewed it and directed numerous alterations and additions. Collier Affidavit, paras. 4–19, Exhibits B–E to Collier Affidavit. While this is so, the court is required to make its own appraisal of plaintiffs' charges. *See* Rule 14a–9(b), 17 C.F.R. § 240.14a–9(b)(1974), and Rule 14a–6, 17 C.F.R. § 240.14a–6 (1974); *cf.* General Tire Corp. v. Talley Industries, Inc., 403 F.2d at 163; Klastorin v. Roth, 353 F.2d 182, 183 n. 2 (2d Cir. 1965). It does so in the same numerical sequence in which plaintiffs advance them.

■ 1. *Defendants' failure to file Schedule 13D in April 1974 and July 1974:* There is no need to advise the stockholders of a four-year old violation of § 13(d), for substantially all the reasons which led this court to deny plaintiffs injunctive relief in the portion of this opinion which dealt with plaintiffs'

---

21. In Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1301–1302 (2d Cir. 1973), there is an excellent analysis of the "materiality" test in the § 14(a) environment. In *Mills* the purpose of § 14(a) was set forth:

§ 14(a) stemmed from a congressional belief that "[f]air corporate suffrage is an important right that should attach to every equity security bought on a public exchange." HR Rep.No. 1383, 73rd Cong.2d Sess., 13. The provision was in-

tended to promote the free exercise of the voting rights of stockholders" by ensuring that proxies would be solicited with "explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought." Id., at 14; S.Rep. No. 792, 73rd Cong. 2d Sess. 12; see 377 U.S. at 431, 84 S.Ct. 1555.
396 U.S. at 381, 90 S.Ct. 616. *See also* J. I. Case v. Borak, *supra.*

§ 13(d) claims. As to the events of July–August 1974, this court has found no violation of § 13(d). *Cf.* Missouri Portland Cement Co. v. Cargill, Inc., 498 F.2d 851 (2d Cir. 1974).

2. *The Hellmuth resignation:* Defendants' Proxy Statement adequately discloses the facts of the Hellmuth resignation. Smallwood v. Pearl Brewing Co., 489 F.2d 579 (5th Cir. 1974).[22]

3. *The lack of an independent appraisal:* After commencement of suit defendants in fact obtained "an independent outside review of the fairness of the purchase price for Multi-Amp's business." This review, by Edwards & Hanly, has cleared the Commission and was mailed to stockholders on or about October 16, 1974. Moreover, plaintiffs are guilty of a misguided invocation of § 14(a) and Rule 14a–9a in any case. They are directed at disclosure; they do not create a "fairness" cause of action. *Cf.* Popkin v. Bishop, 464 F.2d 714 (2d Cir. 1972). Thus, even if there had been no independent appraisal, there would be no infraction of the proxy statutes and rules.[23]

4. *The Combustion Engineering matter:* There was no necessity to disclose in the Proxy Statement the "overture" by Combustion Engineering, Inc. There was one telephone call, on or about August 13, 1974, by a Mr. Kiamie, and there was no follow-up whatever. It was but a casual inquiry, and not in the "firm offer" category of Research Cottrell or Perkin-Elmer, both of which were disclosed. *See* note 13, *supra*. *Cf.* Gerstle v. Gamble-Skogmo, Inc., 478 F. 2d at 1291–1292.

Moreover, the statement that there can be no assurances of other offers "to acquire the corporation" in the future is not misleading. The court accepts defendants' statement that this was included at the Commission's direction. Collier Affidavit, paras. 16–17.

5. *The Berick associations:* The failure to disclose the associations of Mr. Berick with Lerner-controlled companies is in a different category. It

22. As the court stated in *Smallwood:*

. . . Difficult decisions must be made as to what information to place toward the beginning and what to place further toward the end of proxy statements, what to emphasize and what to state more blandly. It is, of course, impossible to emphasize everything, and every fact cannot be contained in the beginning. (citations omitted) We require those who draw up proxy statements to be fair and sensitive to the needs of shareholders in exercising their rights of corporate suffrage. But we do not require that the writers of proxy statements be clairvoyant. . . .

489 F.2d at 602. Nor does the court find the doctrines of "buried facts" and "similar emphasis" violated by the location in the Proxy Statement of the Hellmuth letter. *Id.* at 603.

23. Plaintiffs, in their Reply Brief at 23, highlight another one of their claims related to defendants' alleged failure to disclose sufficient details as to how the approximate $5.5 million price for M–A's assets was settled upon:

Nowhere in their Brief do defendants confront one of their most damaging Section 14(a) violations: their failure to disclose the information and forecasts they presented to the lenders who are financing their takeover of Multi-Amp. Defendants' reluctance to confront this omission may well result from the fact that they cannot justify presenting certain information to those assisting them in buying the corporation, yet concealing this same information from the stockholders from whom they are purchasing the corporation.

Lamentably, as defendants point out, (Defs. Rebuttal Br. at 4–8), plaintiffs have placed nothing before the court by way of such "information and forecasts" and thus, at this juncture, there is nothing to suggest that defendants are withholding such information as would indicate that the offered price is unrealistically low. Should it later appear that such information was available and was withheld, and that it was material, a suit for damages and/or rescission for violating Rule 14a–9(a) is available, Gerstle v. Gamble-Skogmo, Inc., 478 F.2d at 1303, as is one for breach of fiduciary obligation under state law. Gerstle v. Gamble-Skogmo, Inc., 298 F.Supp. 66 (E.D.N.Y.1969). *But see* Gerstle v. Gamble-Skogmo, Inc., 478 F.2d at 1291–1295, regarding Commission skepticism of projections and forecasts.

must be concluded that this omission is material, in that the information might well be considered important by a reasonable shareholder who was weighing how to cast his vote. As plaintiffs persuasively argue (Brief at 29–30), Berick's position is particularly sensitive because of the "inherent conflicting interests" of Lerner, Saltzman, Redlhammer and Esquivel (Proxy Statement at 3), and the fact that Baker's first Board meeting, on August 15, 1974, was that which saw the Proxy Statement and transaction with MUL approved by the Board. In this regard it is noted that the Commission's letter of August 6, 1974, at para. 2(a), directed that the Proxy Statement set forth "the affiliation of the parties involved . . . ." Thus, it is important for the stockholders to know not only that Berick's firm is counsel for M–A (*see* Proxy Statement, "Legal Matters"), but also of his own affiliation with other Lerner enterprises, including but not limited to Realty ReFund Trust and ReFund Advisors, Inc., both of which are listed under Lerner's name in the 1974 Proxy Statement (at 18).

Accordingly, this information regarding Berick should be transmitted by a "supplemental letter" (Defs. Br. at 37) to M–A's shareholders. *Cf.* Corenco Corp. v. Schiavone & Sons, Inc., 488 F. 2d at 214–215.[24]

In all other respects, the court finds defendants' Proxy Statement to be in compliance with § 14(a) and Rule 14a–9(a).

---

24. Defendants cannot rely upon plaintiffs to cure a proxy statement defect. *See* Kohn v. American Metal Climax, Inc., 458 F.2d 255, 290 n. 47 (3d Cir.) (Adams, J., concurring and dissenting), cert. denied, 409 U.S. 874 (1972).

25. The interplay of federal and state enforcement in this area, complicated by the exclusivity of federal jurisdiction conferred by § 27 of the Exchange Act is treated in Loss, The SEC Proxy Rules and State Law, 73 Harv.L.Rev. 1249 (1960). *See also* Campbell v. Loew's, Inc., 134 A.2d 852 (Ch. Del.1957); American Hardware Corp. v. Savage Arms Corp., 136 A.2d 690 (Sup.Ct. Del.1957); *cf.* Federal Home Loan Bank

*Plaintiffs' State-Created Claims*

Pendent to plaintiffs' Exchange Act claims are their claims that the Lerner group, as directors and controlling stockholders, have violated their fiduciary obligations to M–A and its other stockholders by entering into a contract with MUL for the sale of M–A's assets for an inadequate and inequitable price, and by soliciting proxies therefor by means of false and misleading proxy materials.

The allegations addressed to defendants' proxy materials have already been discussed.[25] Now the "fairness" issue must be confronted, albeit in the restricted context framed by the current procedural stage, wherein plaintiffs seek the interim relief earlier detailed.

 Both as directors and as dominant stockholders, Lerner, Saltzman, Redlhammer and Esquivel stood in a fiduciary relationship to M–A, their corporation, and to its minority stockholders. Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281 (1939); Southern Pac. Co. v. Bogert, 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099 (1919).[26] Their fiduciary obligations must be determined from the law of New Jersey, M–A's state of incorporation. Rogers v. Guaranty Trust Co. of New York, 288 U.S. 123, 136, 53 S.Ct. 295, 77 L.Ed. 652 (1933).

As plaintiffs concede, and defendants proclaim, the principle of a century ago that any contract between a director and his corporation was voidable at the instance of the corporation or its share-

---

Board v. Greater Del.Val.Fed. S. & L. Ass'n., 277 F.2d 437 (3d Cir. 1960), disparaging the application of the SEC's proxy rules to controversies out of the Commission's jurisdiction.

26. Of course, under certain circumstances, a close analysis of the fiduciary obligation imposed is required. As Mr. Justice Frankfurter stated in SEC v. Chenery Corp., 318 U.S. 80, 85, 63 S.Ct. 454, 87 L.Ed. 626 (1943), "to say that a man is a fiduciary only begins analysis; it gives direction to further inquiry. To whom is he a fiduciary? What obligations does he owe as a fiduciary? In what respect has he failed to discharge these obligations?"

holders, without regard to the fairness of the transaction, has been supplanted widely, and in New Jersey by N.J.S.A. 14A:6–8, which in pertinent part provides:

> *Effect Of Common Directorships And Directors' Personal Interest.*— (1) No contract. or other transaction between a corporation and one or more of its directors . . . or . . . any . . . corporation . . . in which one or more of its directors are directors or are otherwise interested, shall be void or voidable solely by reason of such common directorship or interest, or solely because such director or directors are present at the meeting of the board or a committee thereof which authorizes or approves the contract or transaction, or solely because his or their votes are counted for such purpose, if
>
> (a) the contract or other transaction is fair and reasonable as to the corporation at the time it is authorized, approved or ratified; or
>
> (b) the fact of the common directorship or interest is disclosed or known to the board or committee and the board or committee authorizes, approves, or ratifies the contract or transaction by unanimous written consent, provided at least one director so consenting is disinterested, or by affirmative vote of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or
>
> (c) the fact of the common directorship or interest is disclosed or known to the shareholders, and they authorize, approve or ratify the contract or transaction.

■ While no New Jersey decision has as yet addressed the subject, it is this court's view that, notwithstanding the use of "or" to connect the subdivisions of the statute, the preferable construction is to require that a particular transaction pass muster under each subdivision. Israels, The Corporate Triangle—Some Corporate Aspects of the New Jersey, New York and Delaware Statutes, 23 Rutgers L.Rev. 615, 627 (1969); *and see,* Remillard Brick Co. v. Remillard-Dandine Co., 109 Cal.App.2d 405, 241 P.2d 66 (1952), applying a similar construction to § 820 of the California Corporations Code, from which 14A:6–8 was derived. As the California court states, the requirements of the fiduciary obligation of a director are not lessened because he may disclose to his co-directors his interest in a transaction with the corporation. *See also* Kennerson v. Burbank Amusement Co., 120 Cal.App.2d 157, 260 P.2d 823 (1953). Accordingly, the oft-stated duty of the director is still applicable:

> A director is a fiduciary. (citation omitted) So is a dominant or controlling stockholder or group of stockholders. (citation omitted) Their powers are powers in trust. (citation omitted) Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. (citation omitted) The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside. . . .[27]

Pepper v. Litton, 308 U.S. at 306, 60 S. Ct. at 245.

■ The parties disagree over whether the aforesaid statutory revision operates to relieve a director of the burden of proving the fairness of contracts

---

27. This statement of principles is not unlike that of New Jersey, where "utmost fidelity" is required of directors in their dealings with the corporation and its shareholders. *Hill Dredging Corp. v. Risley,* 18 N.J. 501, 530–531, 114 A.2d 697 (1955); *Daloisio v. Peninsula Land Co.,* 43 N.J.Super. 79, 88, 127 A.2d 885 (App.Div.1956).

between his corporation and himself. Manifestly it does not. This court, like the California courts in *Remillard* and *Kennerson,* perceives nothing in the revised enactment to suggest that the legislature intended it to alter the traditional doctrine that a fiduciary who engages in self-dealing must endure the burden of proving that a challenged transaction is fair and equitable. Thus the Commissioners' Notes accompanying the statute are enlightening:

> Subsections 14A:6–8(1) and 14A:6–8(2) of this section have been adapted from section 820 of the California Act and have no counterpart in Title 14. Substantially similar provisions are contained in the New York and Delaware Acts. The rule presently in effect in New Jersey is that any contract or other transaction between a corporation and one or more of its directors is voidable at the election of the corporation unless the party seeking to enforce the contract or transaction demonstrates by *clear and convincing proof* that it is honest, fair and reasonable. Abeles v. Adams Engineering Co. Inc., 35 N.J. 411, 428–429, 173 A.2d 246 (1961). The Commission believed that this rule operates harshly in many cases, and that the rule stated in this section would eliminate the inequities and uncertainties caused by the present rule, *leaving undisturbed the power of the courts to deal with such matters under general equitable principles.* (emphasis supplied).

The change worked by the statute, then, does not relieve the directors of the burden, as fiduciaries, of proving the fairness of the transaction. It simply sets a less stringent standard for the requisite proof, substituting the "preponderance of the evidence" test for the "clear and convincing" requirement. No other conclusion can be reasonably drawn from the underscored portion of the aforesaid commentary.

Now to be considered is whether the defendants have sufficiently demonstrated, at this stage of the case, the fairness

of the challenged transaction, and their compliance with the other provisions of 14A:8–6.

 On the issue of fairness, it is noted that the amount per share a shareholder will receive ($6.04) is 31% over the closing market price of 4⅝ on July 26, 1974; and is in excess of the per share book value as at April 30, 1974 ($5.64) and the per share net tangible asset figure ($5.22) as at the same date. Moreover, since commencement of suit, defendants, as has been recounted earlier, have obtained an independent appraisal which styles as fair the price set for M–A's assets.

Plaintiffs oppose this evidence with none of their own. Their flimsy reference to M–A's proposed transaction with Research-Cottrell is unpersuasive. These discussions were terminated, not only because the Research-Cottrell shares had greatly diminished in value, but because they gave every indication of continuing their plunge—which is exactly what occurred. Accordingly, the court finds at this time that defendants have made a prima facie showing of the fairness of the challenged transaction.

At oral argument plaintiffs' counsel, in recognition of the weakness of his position on the issue of fairness, suggested that, if management wins the election, he be allowed a brief period thereafter to obtain "fairness" proof before the M–A/MUL sale's culmination. This court cannot put itself into the position of favoring one side or the other in this case. Thus it will not order defendants at this time to defer consummation of the transaction for any period after the meeting, should defendants prevail in the voting.

As to the other provisions of 14A:6–8, when the M–A Board voted on August 15, 1974 to approve the challenged transaction, there was disclosure of the interest in MUL of the Lerner group, there was "unanimous written consent", and among those consenting were Baker and Berick, who, so far as the record presently stands, were and are "disinterested

directors" under N.J.S.A. 14A:6–8(b). Furthermore, "the fact of the common directorship or interest" [N.J.S.A. 14A:6–8(c)] is being disclosed in the Proxy Statement; the shareholders will be thus advised.

Under all the circumstances, therefore, plaintiffs are not entitled to interim relief on their state-based claims.[28]

*Defendants' Claims*

1. The derivative actions should be dismissed since plaintiffs do not fairly and adequately represent the shareholders of Multi-Amp.

Rule 23.1 of the Federal Rules of Civil Procedure, entitled "Derivative Actions by Shareholders", provides in relevant part as follows:

> . . . The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation . . . .

Defendants contend that the named plaintiffs, and the alleged real parties in interest who stand behind them, cannot, because of their own unique private interests, fairly and adequately represent the remaining M–A shareholders.[29] *See* Answer, Fifth Defense, para. 24.

The burden thus assumed by defendants is a heavy one in view of the law's regard for those who seek to vindicate a corporation's rights. *See* Surowitz v. Hilton Hotels Corp., 383 U.S. 363, 86 S. Ct. 845, 15 L.Ed.2d 807 (1965).[30]

On the basis of what is before the court at this time, the interests of Scott and Puttkammer are not such as would justify dismissal of the derivative causes of action herein at this early juncture. Scheuer v. Rhodes, 416 U.S. 1683, 40 L. Ed.2d 90 (1974); Conley v. Gibson, 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Nolen v. Shaw-Walker Co., 449 F.2d 506, 509 (6th Cir. 1971), upon which defendants rely, is inapposite.[31] The fact of Gross' interest is not overlooked. However, Fed.R.Civ.P. 23.1 speaks of "plaintiff"—it is he, not someone who may be lending him financial assistance, who is to be looked to in order to determine if the interests of the shareholders will be fairly represented.

2. Plaintiffs' violation of § 13(d).

Critical to defendants' charge that plaintiffs have violated § 13(d) is whether National Securities & Research Corp. (NSRC), for purposes of that statute, is a member of plaintiffs' "group". Defendants requested and were granted an evidentiary hearing on this question. Testimony before the court, and in deposition, has been taken from Lawrence Kahn and William Bradford of NSRC; Messrs. Waldman and Graf, counsel for NSRC; and Donald Goebert, a member of plaintiffs' slate of nominees for directors.

28. The complaint also asserts claims founded on defendants' alleged negligence, primarily because defendants do not as yet have financing and are, through the agreement between M–A and MUL, given an option to acquire M–A's assets. No substantial issue is presented now insofar as interim relief is concerned.

29. The burden is on the defendants to establish and to obtain a finding of inadequate representation. Smallwood v. Pearl Brewing Co., 489 F.2d at 593 n.15. On the issue of adequacy of representation, *see* Landy v. Federal Deposit Ins. Corp., *supra*; 3B Moore's Federal Practice, ¶ 23.1.16[1].

30. In the case at bar, it is noted, it can be argued that the proposed sale of assets advanced, assuming *arguendo*, that the price is set too low, creates both an individual cause of action and a derivative cause of action. *Cf.* Borak v. J. I. Case Co., 317 F.2d 838 (7th Cir. 1963).

31. Fed.R.Civ.P. 23.1 does not create a derivative cause of action. It is state-created, here by N.J.S.A. 14A:3–6. Plaintiffs concede they have not made the required demand upon M–A, claiming futility. *See* Landy v. Federal Deposit Ins. Corp., 486 F.2d 139 (3d Cir. 1973). Defendants do not contest this point. They do raise in their answer, however, plaintiffs' failure to allege they were shareholders of M–A "at the time of the transactions and acts complained of, or that their shares thereafter devolved upon them by operation of law." Answer, Fourth Defense, para. 23.

On November 11, 1974 a consent order was entered which provides for deferral of this issue until counsel for NSRC have an opportunity to respond to defendants' contentions. The order further provides that the meeting will go forward on November 14, 1974, with the shareholder votes being appropriately separated until the court rules on the defendants' § 13(d) counterclaim.

3. Plaintiffs' violations of § 14(a).

In view of the parties' desire that the meeting proceed, as provided in the aforementioned order of November 11, 1974, I will defer a decision on this claim as well.

Submit an appropriate order.

### SUPPLEMENTAL OPINION

The parties having completed their submissions, my determination on the reserved matters follows.

*Defendants' § 13(d) counterclaim*

Defendants contend that by reason of certain activity, including discussions and meetings, plaintiffs and others became a "group" under § 13(d)(3) and hence a "person" for § 13(d)(1) purposes; therefore, their argument runs, since the aggregate shares held by this "group" exceeded five percent of the outstanding M–A shares, it had to make a timely filing of a Schedule 13D. Since there was no such filing by the alleged "group", defendants would have me enjoin the individuals in the group from voting and exercising any rights at the November 1974 annual meeting.

The shareholders claimed to constitute the "group" are as follows: NSRC; William M. Scott, III; Charles W. Puttkammer; Isidor M. Gross; Drexel Equity Fund, Inc. and Donald F. U. Goebert (Defs. Exhibit "D", 11/19/74).

Defendants predictably have aimed most of their fire at NSRC, investment adviser to National Securities Growth Fund (NSGF), a publicly held mutual fund, without whose 89,000 shares (9.-7% of the total shares outstanding), the five percent threshold for triggering the Schedule 13D filing requirement would not be reached by the total holdings of the balance of the members of the alleged "group".[1]

After a most careful review of the record of this proceeding, and the voluminous submissions, I conclude that NSRC cannot be viewed as a member of the alleged "group".[2]

The requisites for finding that a "group" exists under § 13(d)(3) have been set forth in Texasgulf Inc. v. Canada Development Corp., 366 F.Supp. 374, 403 (S.D.Tex.1973):

> It takes more than the arithmetic of adding up shares to determine that a statutory group exists and that a filing must be made. Two criteria must be met: (1) The members must agree to act together for the purpose of acquiring, holding, or disposing of securities; and (2) once the members agree to act, they must own beneficially or acquire beneficially in excess of 5% of a class of equity security. Mere relationship, among persons or entities, whether family, personal or business, is insufficient to create a group which is deemed to be a statutory person. There must be agreement to act in concert.

*See also* GAF Corp. v. Milstein, *supra.* As the following facts demonstrate, NSRC's activity falls far short of manifesting an agreement with others, including plaintiffs, to acquire, hold, or dispose of M–A's securities.

NSRC was convinced that M–A's management, by its conceded self-dealing

---

1. Defendants have alleged that Drexel Equity Fund, Inc., which holds 30,000 shares of M–A stock and is claimed to control an additional 10,000 shares, is a part of plaintiffs' "group" for § 13(d) purposes (Defs. Exhibit "D", 11/19/74). However, defendants have

failed to provide sufficient evidence to show that Drexel is a member of the "group".

2. In this discussion I find it unnecessary to cover the troublesome question of whether NSGF would be responsible for a statutory violation by NSRC.

with MUL, had proposed a grossly inadequate price ($6.04 per share) for all of M–A's assets. Bradford, T 51. Thus, when in late July 1974 NSRC representatives first learned of the proposal, Mr. Kahn of NSRC directed Mr. Bradford, NSRC's senior securities analyst, to contact Mr. Lerner to "find out what it was all about." Kahn Dep., 14. Kahn and Bradford then met with Lerner and told him the proposed transaction was unfair to M–A's shareholders. Id. 15–17.

After his meeting with Lerner, Kahn spoke by telephone with Mr. Gross. Id. 18. Both felt that the management proposal was unfair; and Gross suggested they meet. Id. 19.

Their meeting occurred on August 19, 1974, with Mr. Scott accompanying Mr. Gross, and NSRC represented by Messrs. Kahn, Bradford and Ardizzone. All present were still opposed to the proposed sale of assets. Id. 23–24. Kahn stated NSRC had referred the matter to its counsel for advice; and Gross intimated he might initiate suit in New Jersey. Id. 25. Kahn "made it very clear" that NSRC would not participate in forming a slate of nominees for directors, that its only interest was to protect its own shareholders, and that it was awaiting its counsel's advice. Id. 26.

On August 21, 1974 NSRC's investment committee met. Because they "felt that this looked like an inside steal and that we shouldn't be a part of it", the committee determined not only to vote against the proposed transaction but also against the reelection of the management Board of Directors. Id. 34. At this time NSRC was not certain whether there would be a slate in opposition to management's. Although Mr. Scott and Mr. Gross mentioned "casually" that they might put up a slate of directors in opposition, NSRC had no knowledge that such a slate would be advanced or who would be on such a slate; and following the August 21, 1974 meeting NSRC, or NSGF, transmitted its proxy. Id. 37.

No one at NSRC was thereafter in communication with either Mr. Scott or Mr. Puttkammer, "[o]r any other person in opposition to the proposal with respect to voting for an opposition slate". Id. 36.

A few days after receipt of the management proxy, Mr. Kahn received a telephone call from a representative of Drexel Equity Fund, and later from another M–A shareholder, a Mr. Shapiro. Both announced they were opposed to the assets sale and were advised by Kahn that he was as well.

NSRC's counsel had withheld their advice until they received management's proxy material.

At a subsequent time in late August 1974, Mr. Gross telephoned Mr. Kahn again to advise him he was consulting counsel, Everett M. Scherer, Esq., to which Mr. Kahn responded that NSRC might contribute up to $500 for legal expenses. Id. 41–42. Neither Kahn, nor anyone else on behalf of NSRC, ever firmed up this offer, and no such contribution was ever made.

On September 4, 1974 a meeting was held at the offices of Riker, Danzig, Scherer and Brown in Newark, the firm retained by plaintiffs herein. Counsel for NSRC were present. Discussion was had regarding the assets transaction, management's proxy material, and the procedures intended to be followed by those opposed to management's proposal. NSRC's counsel left with Messrs. Scherer and Weiss, Mr. Scherer's partner, a copy of a draft of a proposed complaint, omitting plaintiffs' names. Obviously there was reflected at this meeting a feeling that the price offered for the assets was not fair. Waldman Dep. 9.

Plaintiffs were at this meeting. Scott and Puttkammer stated they were going to be plaintiffs; Gross, also present, stated he would not be. Mr. Waldman, an attorney for NSRC, stated NSRC would not be a plaintiff. Mr. Waldman also stated, when asked if NSRC would contribute to litigation expenses, that

the answer was "no" but he "would talk to his client." *Id.* 26. Thereafter NSRC confirmed for Mr. Waldman that it would make no contribution.

Subsequent to the meeting of counsel, Mr. Weiss transmitted to NSRC's counsel copies of documents by the parties to this suit. There were no further meetings between counsel, and there was no participation in or advice about the ensuing litigation, or plaintiffs' proxy preparation or solicitation, by NSRC or anyone on its behalf.

 Defendants tender no decisional authority, nor has this court's independent research disclosed any, which would warrant expanding the concept of a § 13(d)(3) "group" to include NSRC within the orbit of plaintiffs and their allies. Water & Wall Associates Inc. v. American Consumer Industries, Inc., *supra.* The meetings, conferences and telephone calls reflect little more than that concerned shareholders were communicating with NSRC to ascertain its views as a 10% shareholder. Given NSRC's joinder with the Lerner group, the proposal would have been almost impossible to defeat. To the extent that plaintiffs sought to have NSRC form a common and active front they were unsuccessful. NSRC contributed no funds, provided no advice (other than the draft of a complaint), furnished no support to the opposition's solicitation of proxies, did not join in the lawsuit, and, in all respects, did nothing more than would be required to represent its own interest. Thus, on the facts before me at this time, defendants' request for preliminary injunctive relief on their § 13(d) counterclaim must be denied.

*Defendants' § 14(a) counterclaim*

Defendants also urge a construction of Rule 14a–11 that would bring the activities of plaintiffs and those opposing the sale of assets within the ambit of federal proxy regulation. This claim implicates Rule 14a–11(c)(1), 17 C.F.R. § 240.14a–11(c)(1) (1974):

No solicitation subject to this rule shall be made by any person other than the management of an issuer unless at least five business days prior thereto, or such shorter period as the Commission may authorize upon a showing of good cause therefor, there has been filed, with the Commission and with each national securities exchange upon which any security of the issuer is listed and registered, by or on behalf of each participant in such solicitation, a statement in duplicate containing the information specified by Schedule 14B.

In conformity with the broad definition given to the term "solicitation",[3] defendants argue that meetings and communications among plaintiffs and other individuals for the purpose of arousing opposition to the transaction constitute a proxy solicitation. They contend that plaintiffs' filing of Schedule 14B on September 30, 1974 was untimely since an opposition slate of directors had been selected in early September and attempts by shareholders challenging the transaction to consolidate support to defeat the proposal at the annual meeting began several months before the filing. It is arguable that when the activities of a group are part of "a continuous plan" intended to result in solicitation, the filing requirements of the proxy rules may be actuated before the actual solicitation occurs. *See, e. g.,* Studebaker Corp. v. Gittlin, 360 F.2d 692, 696 (2d Cir. 1966).

Thus, defendants essentially contend that communications among shareholders opposing the sale of assets either

---

3. See Rule 14a–1, 17 C.F.R. § 240.14a–1(f) (1974) which provides:

(1) The terms "solicit" and "solicitation" include:

(i) Any request for a proxy whether or not accompanied by or included in a form of proxy;

(ii) Any request to execute or not to execute, or to revoke, a proxy; or

(iii) The furnishing of a form of proxy or other communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy.

constituted solicitation or were part of a continuous plan intended to culminate in a solicitation of all voting shareholders. This argument is rejected.

■ As hereinbefore indicated, this court does not view the discussions between NSRC and other shareholders opposed to the transaction in question as substantial enough to trigger the filing requirements of the Williams Act. The same considerations apply with equal force to the proxy regulations. The primary concern among shareholders who opposed the transaction herein was to block management from selling M–A's assets to MUL for an inadequate consideration. There is evidence to indicate that these shareholders were contemplating litigation to forestall approval of the sale at the annual meeting. This, however, does not prove that a solicitation in opposition to the proposal was in the offing. This court does not believe that the term "solicitation" was intended to apply to communications from one stockholder, who is opposed to a transaction, to another, who is also opposed, or to meetings among shareholders who are of all the same mind that M–A's directors are acting unfairly in connection with the sale of assets and liquidation of the corporation. Persons who have invested money in a corporate entity should be free to express their mutual concern among themselves when there exists a plan to liquidate the corporation. The mere fact that these persons are shareholders does not raise such communications to the level of proxy solicitation. *Cf.* Twentieth Century Fox Film Corp. v. Lewis, 334 F.Supp. 1398, 1401 (S.D. N.Y. 1971).

■ Furthermore, the evidence is inadequate to establish that plaintiffs and the other persons named in the counterclaim were involved in a continuous plan intended to result in a proxy solicitation to all shareholders of M–A.

On September 30, 1974, Goebert, Puttkammer, Scott, Gross and the Multi-Amp Shareholders Protective Committee filed their solicitation materials as required by Rule 14a–11(c)(1). Defendants have failed to show that this filing was untimely. The proxy statement of the Multi-Amp Shareholders Protective Committee is dated October 14, 1974 (Defendants' Exhibit, Goebert #1). Goebert has testified that he spent October 14, 15 and 16, 1974, putting the opposition's proxy statements in the mail. (Goebert Dep. at 27, L. 14 to 28, L. 6). The defendants have not rebutted this evidence. Therefore, those contesting the sale of assets complied with the filing requirements of Rule 14a–11(c)(1) since they filed their proxy statements more than five days prior to the actual solicitation.

Defendants also allege that the Schedules 14B filed by members of the opposition are materially deficient and misleading. Since defendants have not submitted these documents for examination by the court, this contention is rejected. Moreover, giving full credence to the arguments made in defendants' submissions, I would deny the claim on its merits if it were properly before me.

Finally, it is noted that the Commission has reviewed the Schedules 14B and amendments thereto which have been filed by pertinent members of the opposition. While this court is not bound by the Commission's response to these filings, the fact that the Commission has not sought to enjoin the use of the opposition's proxies at the annual meeting certainly suggests that the schedules adequately comply with proxy rules and regulations. *See, e. g.* General Time Corp. v. Talley Industries, Inc., 403 F.2d 159, 163 (2d Cir. 1968), cert. denied, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969); Twentieth Century Fox Film Corp. v. Lewis, 334 F.Supp. at 1402; McConnell v. Lucht, 320 F.Supp. 1162, 1166 (S.D.N.Y.1970).

Hence, defendants' § 14(a) counterclaim is also undeserving of injunctive relief.

An appropriate order should be submitted on 3-days notice.